UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
X--------------------------------------------------X

UNITED STATES OF AMERICA, Index No. 23-cr-622(JMF)

-v.-

MICHAEL CASTILLERO,

Defendant.
X--------------------------------------------------X

**MICHAEL CASTILLERO'S MEMORANDUM IN AID OF SENTENCING**

LAW OFFICES OF
DANIEL A. MCGUINNESS, PC
Daniel A. McGuinness
353 Lexington Ave, Suite 900
New York, NY 10016

ZMO LAW PLLC
Tess Cohen
353 Lexington Ave, Suite 900
New York, NY 10016
(212) 685-0999
tc@zmolaw.com

## Table of Contents

Introduction ..... 1

Personal History ..... 1

Offense Conduct ..... 3

A Sentence Substantially Below Probation's Recommendation of 120 Months' Imprisonment is Sufficient to Achieve the Ends of Justice in this Matter. ..... 8

A. The Guidelines in this Case do not Aid the Court in Fashioning a Sentence that is not Greater than Necessary ..... 8

B. Mike's Sentence Should Reflect his Personal Characteristics ..... 11

C. The Collateral Consequences of this Case on Mike and His Family are Severe ..... 12

D. A Lengthy Prison Sentence is not Necessary for Deterrence ..... 13

E. Forfeiture and Restitution ..... 14

Conclusion ..... 15

**Table of Exhibits**

| **Ex.** | |
|---|---|
| A | Letter of Support from Nikki M. Castillero |
| B | Letter of Support from [redacted] |
| C | Letter of Support from [redacted] |
| D | Letter of Support from Joseph Barsalona |
| E | Letter of Support from Danielle Mongelli |
| F | Letter of Support from Lucky Ott |
| G | Letter of Support from Heather Vance |
| H | Letter of Support from Mario Picone |
| I | Letter of Support from Jeanette Mazzola |
| J | Letter of Support from Andy Hogue |
| K | Letter of Support from Msgr David Cassato |
| L | Letter of Support from Ephraim Rosenburg |

## Introduction

Michael Castillero has always worked to provide financial security for his family. He now finds himself about to be sentenced to prison with everything he worked for in jeopardy. His family has experienced significant emotional and financial hardship since the investigation and indictment in this case and now face losing their home and an uncertain future.

## Personal History

Michael Castillero was born in Panama City, Panama, and spent his earliest years there in a close-knit family. When political developments prompted his family to relocate, he joined his parents first in Miami as a child and later moved with them to Staten Island during his adolescence. Those moves required repeated adaptation—new schools, new neighborhoods, and new responsibilities. Mike assumed significant household duties early: he helped care for his younger sister, prepared meals, and took on chores while his parents worked long hours to support the family. Those responsibilities curtailed the time he could spend socializing as a teenager and instilled in him a pattern of taking care of others that continued into adulthood.

In school Mike combined academics with athletics and part-time work. He attended several local high schools after the family's moves and was active as a competitive swimmer through graduation in 1996. Even as a student he balanced outside employment with his studies and family obligations, working local jobs while attending community colleges for a period. That mix of school, sport, and

work taught him time management, a strong work ethic, and the habit of supporting household needs rather than relying on others to provide for him. Those early years in the workforce—marked by steady employment, commission-based roles, and responsibility for client portfolios—laid the foundation for his later roles in the financial sector and for his eventual decision to launch StraightPath.

Mike's immediate family remains tightly bound to him even as his relationships with his family of origin have become strained or distant. He has been married to Nikki for over a decade, and they have built their household around shared parenting of their children, (13) and (10). Nikki describes the present structure of their home as "primarily" dependent on her full-time caregiving and Mike's role in "supporting and maintaining family continuity," emphasizing that his daily presence undergirds their children's routines, school engagement, and emotional stability. Ex. A. calls Mike his "best friend" who "helps me with school and pushes me to do better," while lists the everyday acts—school runs, cooking, cheering her up on bad days—that make her father's presence feel indispensable. Ex. B; Ex. C. Nikki notes that the family has already endured "significant financial disruption and instability," including restrictions on access to financial resources and difficulty maintaining prior standards of stability since 2021, and that any custodial term would remove the only adult capable of replacing Mike's current mix of emotional and practical support. Ex. A; see PSR ¶128, ¶135–139.

In contrast, Mike's extended family relationships are either limited or markedly strained. His parents, who reside in Florida, have largely distanced themselves, viewing his arrest as a "negative reflection of their entire family," and that communication has "dwindled" as a result, despite Mike's extensive financial support of his parents prior to his arrest. PSR ¶101. His relationship with his younger sister has been dormant for years. They "naturally grew apart" and he has not had contact with her in approximately six years. PSR ¶102. He does not have meaningful relationships with his paternal half-brothers. *Id.* The one extended relative who remains closely connected is his mother-in-law, Jeanette Mazzola, who writes that she "cares deeply" for him and that her grandchildren "would be truly devastated if he were not able to be there for them," but candidly explains that as a 75-year-old on Social Security she cannot financially substitute for his role. Ex. I; PSR ¶58. In effect, Mike's support network has contracted since his arrest to his wife, children, and a small circle of friends and community members, cementing his nuclear family's dependence on him for financial, emotional and logistical support. Since his arrest and trial, Mike has undertaken any work he could find, including landscaping, to support his family. Pretrial Services reported he worked for MICA Landscape LLC in Stuart, Florida, in 2025 and was being paid in cash. See PSR ¶128–129.

**Offense Conduct**

From 2017 through early 2022, StraightPath Venture Partners operated in the pre-IPO market, offering interests in privately held companies to accredited investors through a series of funds. The jury found that in doing so, StraightPath

engaged in fraudulent practices, including misrepresentations about fees and pricing, the role and history of key personnel, and the treatment of investor funds, and that Mike later participated in obstructive conduct in response to SEC scrutiny. Within that framework, however, the record also reflects that Mike entered the venture believing he had found a legitimate—and potentially win-win—way to create value for himself and for investors, that he was quickly overwhelmed by the company's growth and complexity, and that his greatest failings lay in organization, supervision, and judgment rather than in an original intent to steal.

StraightPath's model, as conceived, was to pool capital from investors and use it to acquire pre-IPO shares in high-profile private companies, then distribute profits when those companies went public. Text messages introduced at trial demonstrate that Mike was "broke" in 2017 and didn't know how he was going to pay the mortgage. *See e.g.* GX 202-1; GX 202-2. He believed he had identified an incredible business opportunity, a type of investment he thought could make him money and could make other investors money too. Early successes—most notably in Palantir and Airbnb—appeared to validate that vision: StraightPath acquired shares, investors made substantial returns on IPO, and distributions were made in line with welcome letters.

As the PSR notes, StraightPath took in approximately $399 million from about 2,000 investors, ultimately operating nine funds and related entities. See PSR ¶16, ¶71–75. The growth was extraordinarily rapid. It expanded from Fund 1 to Funds 2 through 8. On the back end, however, the enterprise remained run by a

small group. The business became "barely manageable" and at times "unmanageable," contributing to mistakes in record-keeping and inventory.

At the same time as business boomed, unbeknownst to Mike, the bottom was about to follow out of the IPO market. After an unprecedented amount of IPO activity in 2021,[1] the market dropped dramatically in 2022.[2] One source explained, "1073 companies IPO'd in 2021, raising $317 billion; in the first half of 2022, the total was just 92 companies, raising just under $9 billion."[3] This change compounded the organizational issues already besetting StraightPath.

Within this structure, Mike's intended role was as an operator rather than an architect of legal and pricing strategy. The trial record demonstrates Mike as responsible for maintaining current lists of available shares, overseeing the referral agents, handling payroll and wire transfers, and issuing checks to investors, while co-founder Martinsen focused on sourcing shares and setting pricing and co-founder Lanaia on compliance, fund administration and paperwork. See PSR ¶18. Texts and testimony confirm that Mike labored in these tasks, fielding calls, coordinating with agents, processing wires, and trying—and often failing—to keep pace with welcome letters and investor communications. See e.g. GX 202-21; GX 202-45. Government witness Eric Lachow admitted during the trial that he "questioned [Mike's]

---

[1] Eloise Barry, *What a Record-Breaking Year for IPOs Tells Us About the US Economy,* TIME (Dec. 13, 2021 9:33AM), https://time.com/6130396/biggest-ipos-2021-rivian-volvo/.
[2] Gaurav Dogra & Patturaja Murugaboopathy, *Tech IPO Market Faces Worst Year Since Global Financial Crisis*, Reuters (Sep. 30, 2022 12:38AM), https://www.reuters.com/technology/tech-ipo-market-faces-worst-year-since-global-financial-crisis-2022-09-29/.
[3] Sarah B. Potter, *U.S. IPO Activity Drops Dramatically in First Half of 2022*, FACTSET INSIGHT (Jul. 13, 2022), https://insight.factset.com/u.s.-ipo-activity-drops-dramatically-in-the-first-half-of-2022.

competency" and thought Melissa Machado—a former waitress who became Mike's assistant—"had skill[s] that Mike didn't have." Tr. 675.

The record that establishes these elements also contains numerous indications that Mike's initial intentions were to participate in a novel, high-risk marketplace in ways he believed could be squared with investors' interests. He and his partners sent investors extensive written materials (PPMs, operating agreements, subscription agreements) and expensive third-party PitchBook reports, at times explicitly urging them in writing to consult independent advisors and emphasizing that investments were "high risk" and "long-term." PSR ¶35–36.

The fund did not seek out or accept unsophisticated or low-income investors. It wanted investors willing and able to accept high risk and potential loss. Investors such as Mr. Reis and Mr. Wells completed suitability questionnaires stating that they were capable of independently evaluating risk, that their objectives were "100% aggressive growth" or "100% speculation," and that they sought double-digit returns with moderate to high risk tolerances. Tr. 119:20–25, 120:1–8, 188:1–25; Def. Ex. 1000–1001. Many had significant net worth and prior investing experience in public markets or private real estate. Tr. 62:1–25, 88:1–25, 165:1–24.

When issuers did go public, StraightPath made distributions to investors, and that the firm issued millions in refunds, such as approximately $7–8 million returned to UiPath investors when that investment could not be completed. StraightPath was working to purchase all shares sold. The instances of

StraightPath selling more than it had acquired are the rare exceptions and mark an error in StraightPath business plan, not a purposeful outcome.

There is also evidence that—at least in the examination phase—Mike attempted some degree of cooperation with regulators. When SEC examinations staff first engaged with StraightPath in 2018–2019, the company voluntarily produced bank records from its core operating accounts even when told such records were being sought on a "voluntary" basis. Those records, showing large payments to agents and principals, became central to the SEC's later case. While Mike later participated in the deletion of certain email accounts, his earlier decision to turn over bank records rather than conceal them suggests that he did not view StraightPath as indefensible.

Mike's organizational weaknesses—incompetent in back-office functions, sloppy and disorganized, forever behind on welcome letters—are distinct from the roles played by his co-defendants. Mike relied on their knowledge of the industry, with Mr. Martinsen setting prices for the shares and Ms. Lanaia handling compliance concerns. He also, unlike Mr. Martinsen and Ms. Lania, was in dire financial straits when he began the business, needing to borrow money from Mr. Martinsen just to pay his mortgage.

Mike is a first-time offender who came to the pre-IPO space seeking mutual profit in a complex, speculative market; who worked intensely but beyond his managerial capacity; who served a largely sophisticated investor base that consciously sought high risk and high reward; and who made errors in judgment

rather than setting out from the beginning to engineer a pure theft scheme. Those nuances are critical in calibrating a just sentence.

**A Sentence Substantially Below Probation's Recommendation of 120 Months' Imprisonment is Sufficient to Achieve the Ends of Justice in this Matter.**

**A. The Guidelines in this Case do not Aid the Court in Fashioning a Sentence that is not Greater than Necessary.**

Mike Castillero joins in all respects to his challenges to the Guidelines made by his co-defendants. He contends the loss amount is overstated, the obstruction enhancement should not apply, and the sophisticated means enhancement is not warranted. However, even properly adjusted, the Guidelines offer no assistance to the Court in crafting an appropriate sentence. The advisory Guidelines should be given no weight at sentencing for an independent reason: their focus on loss is not a rational basis for punishment.

Pursuant to the fraud Guideline, U.S.S.G. § 2B1.1(b)(1), the PSR's proposed loss amount enhances Mr. Castillero's offense level from a base of 7 by 28 levels, to level 35. (PSR ¶¶ 81-82,). Even before the contested enhancements, the loss amount increases Mr. Castillero's advisory sentencing range from 0-6 months to 168-210 months. In other words, loss amount is responsible for fourteen to seventeen-and-a-half years of Mr. Castillero's recommended punishment.

When, as here, a loss amount figure drives such a large increase to a base offense level at the bottom of the Guidelines sentencing chart, "that factor 'entitles a sentencing judge to consider a non-Guidelines sentence' based upon a disagreement with the [United States Sentencing] Commission's 'policy determination' that loss

should be the primary determinant of punishment." *United States v. Burghardt*, 702 Fed. App'x 4, 7 (2d Cir. 2017) (quoting *United States v. Algahaim*, 842 F.3d 696, 800 (2d Cir. 2016)). Specifically, because making loss a principal determinant of sentencing "is an 'unusual[]' approach to culpability, 'unknown to other sentencing systems,'" the district court should "'consider whether the cumulative effect of those enhancements,' in relation to the ... base offense level, should result in a non-Guidelines sentence." *Id.*

The flaws with the fraud Guideline's loss enhancement approach are now well-established. "The loss guideline . . . was not developed by the Sentencing Commission using an empirical approach based on data about past sentencing practices." *United States v. Corsey*, 723 F.3d 366, 377, 379-81 (2d Cir. 2013) (Underhill, J., concurring). Multiple amendments to the loss table, none of which had empirical grounding, "have effectively multiplied several times the recommended sentence applicable in 1987 for large-loss frauds, which itself was set higher than historic sentences." *Id.* at 380. The result is an enhancement that is "fundamentally flawed, especially as loss amounts climb." *Id.*; Kate Stith, *The Arc of the Pendulum: Judges, Prosecutors, and the Exercise of Discretion*, 117 Yale L.J. 1420, 1476 n.235 (2008) ("[T]he Guidelines' 'loss'-penalty tables appear to have been created out of whole cloth, without either statutory or empirical basis. The great weight the Guidelines attached to quantity has been devastatingly criticized, and nowhere explained." (citations omitted)).

Accordingly, there is a local judicial consensus that the loss Guideline should not be followed when, as here, its enhancements elevate the sentencing range to the bottom of the chart. *See, e.g.*, *United States v. Johnson*, No. 16-CR-457-1 (NGG), 2018 WL 1997975, at *3 (E.D.N.Y. Apr. 27, 2018) (loss enhancement policy is a "grievous wrong," and its "problems . . . have been evident since the inception of the Guidelines"); *United States v. Mair Faibish*, No. 12 Cr. 265 (E.D.N.Y. Mar. 10, 2016) (Vitaliano, J.) (sentencing) (observing, like "a whole host of judges who have said so publicly and scores of others who have . . . grumbled about it privately," that "the Guidelines even with its slight revisions, are mindlessly accelerated once you have numbers of any size added in the loss or gain table"); *United States v. Gupta*, 904 F. Supp. 2d 349, 351 (S.D.N.Y. 2012) (Rakoff, J.) ("By making a Guidelines sentence turn, for all practical purposes, on [loss enhancement], the Sentencing Commission ... effectively guaranteed that many such sentences would be irrational on their face."); *United States v. Parris*, 573 F. Supp. 2d 744, 745, 754 (E.D.N.Y. 2008) (Block, J.) (departing downward by 300 months from advisory fraud Guidelines because "the Sentencing Guidelines for white-collar crimes [are] a black stain on common sense"); *United States v. Adelson*, 441 F. Supp. 2d 506, 514-15 (S.D.N.Y. 2006) (Rakoff, J.) (decrying "the utter travesty of justice that sometimes results from the Guidelines' fetish with abstract arithmetic, as well as the harm that Guidelines calculations can visit on human beings if not cabined by common sense"), *aff'd*, 301 F. App'x 93 (2d Cir. 2008); *United States v. Emmenegger*, 329 F.

Supp. 2d 416, 427 (S.D.N.Y. 2004) (Lynch, J.) (the amount of loss is a "relatively weak indicator of the moral seriousness of the offense or the need for deterrence").

Moreover, the very long sentences driven by the loss table are far afield from what was envisioned in creating the fraud Guideline in the first place, *i.e.*, that "a short but definite period of confinement might deter future [white-collar] crime more effectively than sentences with no confinement condition." Stephen Breyer, *The Federal Sentencing Guidelines and the Key Compromises Upon Which They Rest*, 17 Hofstra L. Rev. 1, 22 (1988). "[T]here is considerable evidence that even relatively short sentences can have a strong deterrent effect on prospective 'white collar' offenders." *Adelson*, 441 F. Supp. 2d at 514; *see, e.g.*, A. Mitchell Polinsky & Steven Shavell, *On the Disutility and Discounting of Imprisonment and the Theory of Deterrence*, 28 J. Leg. Stud. 1, 12 (1999) ("less-than-maximal sanctions, combined with relatively high probabilities of apprehension, may be optimal" in white collar context, where "the disutility of being in prison at all may be substantial and the stigma and loss of earning power may depend relatively little on the length of imprisonment").

**B. Mike's Sentence Should Reflect his Personal Characteristics**

Mike's wife describes his steady engagement in family life, writing that he is "consistently engaged" in school-related responsibilities and daily caregiving. See Ex. A, Letter of Support from Nikki M. Castillero. His son [redacted] writes about their close bond, "My dad is my best friend. We laugh together, and he is always there for me." See Ex. B, Letter of Support from [redacted] His daughter [redacted] states,

"I really want my dad to be here with me and my family so we can continue to spend time together," reflecting her reliance on her father. See Ex. C, Letter of Support from [redacted]

Longtime friends attest to Mike's loyalty and integrity. One writes that Mike has "always been a person of integrity and someone I would not hesitate to trust professionally and more importantly personally." See Ex. D, Letter of Support from Joseph Barsalona. Danielle Mongelli recounts that when her husband was critically ill, "Michael called me at least once a week to check on his condition" and that he "put his problems [*i.e.* his arrest and prosecution] aside for my family." See Ex. E, Letter of Support from Danielle Mongelli. Members of Mike's support group describe him as someone who "listens," "reflects," and "is honest about his failures," with Lucky Ott observing that Mike "has shown all of those qualities" of accountability and empathy. See Ex. F, Letter of Support from Lucky Ott; Ex. G, Letter of Support from Heather Vance. Others note his charitable initiatives, including organizing a fundraiser that raised approximately $51,000 for a family in need. See PSR ¶110.

**C. The Collateral Consequences of this Case on Mike and His Family are Severe**

The proceedings have caused acute emotional distress for Mike and his children. This is Mike's first contact with the criminal justice system, and it has taken a toll on him. He has trouble sleeping, feelings of isolation, and episodes of worthlessness since his arrest. See PSR ¶116–117. His family has also suffered material hardship. Mike has always been the provider for his family but has been "broke and borrowing money" during this case. Mike has taken landscaping and

other work—"any work he could find"—to pay bills and support his wife and two children. See PSR ¶128–129; Ex. A, Nikki M. Castillero.

The family's principal residence is implicated in forfeiture proceedings, which has compounded their financial instability. See PSR ¶135–139.Mike's wife describes "significant financial disruption and instability" and explains she left full-time employment to care for the children, increasing the household's dependence on Mike's income. See Ex. A, Letter of Support from Nikki M. Castillero. Mike's mother-in-law states she is a senior on Social Security and "unable to provide the level of support that Mike currently gives to his family," underscoring that extended family cannot replace his role. See Ex. I, Letter of Support from Jeanette Mazzola.

The emotional effect on the children has been tangible. [REDACTED] reports classmates have bullied him due to his father's arrest, and his wife documents the effect on his well-being and school experience. See Ex. B, Letter of Support from [REDACTED] Ex. A, Letter of Support from Nikki M. Castillero; PSR ¶109. Friends who have observed Mike during these proceedings note his "sincere reflection" and efforts to engage constructively with support networks, but also the profound strain the process has imposed on him and his loved ones. See Ex. F, Lucky Ott; Ex. G, Heather Vance.

**D. A Lengthy Prison Sentence is not Necessary for Deterrence**

A lengthy prison sentence is not necessary for either specific or general deterrence. A severe sentence is not necessary to send a strong message as general deterrence to any potential offenders. As noted by Judge Rakoff in *United States v. Gupta*, 904 F. Supp. 2d 349, 355 (S.D.N.Y. 2012), "common sense suggests that

most business executives fear even a modest prison term to a degree that more hardened types might not [therefore] a relatively modest prison term should be 'sufficient, but not more than necessary,' for [general deterrence purposes]." Similarly, any prison sentence will be felt acutely by Mike, who has never served a jail term before. Additionally, the collateral consequences of this case–the difficulties Mike and his family have faced since the commencement of this case–have already specifically deterred any future similar conduct.

**E. Forfeiture and Restitution**

Mr. Castillero joins in his co-defendants' challenges and objections to forfeiture and restitution. Forfeiture is "limited to property the defendant himself actually acquired as the result of the crime." *Honeycutt v. United States* 581 U.S. 443 (2017). Thus, to the extent forfeiture is determined as appropriate, forfeiture should only be ordered for funds Mr. Castillero personally received, not the overall loss amount, as suggested in the PSR. *See* PSR ¶ 156.

Any restitution amounts ordered must reflect the "actual loss" to the victims. *United States v. Gushlak*, 728 F.3d 184, 196 (2d Cir. 2013). The amount of restitution to be paid by a defendant must be reduced by the amount of any money returned to the victims. *U.S. v. Thompson*, 792 F.3d 273 (2d Cir. 2015). In this case, the defense expert accountant has calculated that at least $12,690,376 were returned to the victims in the case. Additionally, the restitution amount should be reduced by the amount of money and value of any shares returned to the victims by the receiver.

**Conclusion**

For the foregoing reasons, Michael Castillero respectfully submits that a sentence substantially below Probation's recommendation of 120 months' imprisonment is appropriate.

Dated: New York, NY
April 1, 2026

Daniel A. McGuinness

Tess Cohen

Tess Cohen

# EXHIBIT A

The Honorable Jesse M. Furman

United States District Court

Southern District of New York

40 Foley Square

New York, NY 10007

Sentencing Date: April 15, 2026

Re: United States v. Mike Castillero

Your Honor,

My name is Nikki Mazzola Castillero, and I respectfully submit this letter in support of my husband, Mike Castillero. I am also the mother of our two children, ████ (13) and ████ (10), who are directly dependent on both of us for care, stability, and support.

Mike and I have been in a committed relationship for approximately 15 years. Throughout that time, we have worked to build a stable household centered on family responsibility and the upbringing of our children. We have made joint decisions over the years intended to support long-term stability for our family unit.

I have known Mike to be consistently engaged in his role as a husband and father. He is actively involved in our children's daily lives, including school-related responsibilities, transportation, and emotional support. Our children rely on his presence and involvement as part of their normal routine and sense of structure.



Our daughter, ████, age 10, maintains a close and consistent relationship with her father. She depends on his daily presence for stability and reassurance, and he plays a central role in her routine and development.

From my own background, I was raised in Bensonhurst, Brooklyn, in a single-parent household, and began working at a young age to support myself. I later attended Hunter College and earned my cosmetology license from the Aveda Institute. I worked as a professional hairstylist in New York for approximately 20 years (2001–2021). These experiences shaped my understanding of financial responsibility, work ethic, and the importance of maintaining stability for one's children.

As a family, we made coordinated decisions over time to support Mike's professional development and his ability to contribute to the household's financial stability. In 2021, during the COVID-19 period, we relocated to Florida. At that time, I stepped away from full-time employment to focus on raising our children.

Since 2021, our family has experienced significant financial disruption and instability, including restrictions on access to financial resources and ongoing difficulty maintaining prior standards of household stability. These circumstances have required continued adjustment in meeting basic household needs.

At present, our household is primarily structured around my full-time caregiving responsibilities and Mike's role in supporting and maintaining family continuity.

From a family perspective, Mike's presence is integral to maintaining stability for our children. His absence would create both emotional and practical hardship, particularly in relation to childcare responsibilities, educational support, and household functioning.

I respectfully ask the Court to consider the direct and ongoing impact that a custodial sentence would have on two minor children who are actively dependent on both parents for stability, supervision, and emotional support during critical developmental years.

Thank you for your time and consideration.

Respectfully submitted,

Nikki Mazzola Castillero

# EXHIBIT B

# EXHIBIT C

# EXHIBIT D

Sun, Mar 29, 2026 at 4:21 PM

Hon. Jesse M. Furman
United States District Court
Southern District of New York
40 Foley Square
New York, NY 10007

Your Honor:

My name is Joseph Barsalona, and I am writing on behalf of Michael Castillero, who will soon be sentenced by this Court.
I am currently a Vice President for a mid size medical distribution company.
I have known Michael since my freshaman year of highschool. I have had the honor of calling Michael my close friend ever since. Spanning our teenage years, young adulthood, and now our parenting years. During that time, I have come to know Michael in many forms as our lives transitioned. Throughout all those periods in life Michael has always been a person of integrity and someone i would not hesitate to trust professionally and more importantly personally. In my personal experience, he has consistently demonstrated loyalty to his friends, parents, sibling, and now his own wife and children. Michael has always demonstrated inclusion; as if to say he was a friend and kind to all. These are not isolated moments but part of a long-standing pattern of who he is as a person.

I am also aware of how difficult the past couple of years have been for Michael and his family. This situation has had profound emotional, financial, and personal consequences for him. I have seen firsthand the toll it has taken, as well as the sincere reflection he has shown throughout this process. It is clear to me that he fully understands the seriousness of the situation and is committed to rebuilding his life in a positive and responsible way.
Your Honor, I respectfully ask the Court to consider leniency and compassion when sentencing Michael. I believe that he has the capacity to move forward productively, support his family, and continue improving himself. I am confident that this experience has already taught him lessons that will shape the course of his life moving forward. Your Honor, as this may not be the place to air such grievances or to presume my humble opinion influences real change in this world. There are currently powerful people whose choices and decisions do effect the daily lives of people around the world; operating with impunity after far worse and despicable crimes. Sentencing Michael, a peaceful family man, and letting these miscreants live freely tells the good people of our country finance is far more important then children and young adults lives and sanctity.

Thank you for your time and consideration.

Respectfully,
Joseph Barsalona

Submitted via email: [redacted]

# EXHIBIT E

March 30, 2026

The Honorable Jesse M. Furman
United States District Court
Southern District of New York

Dear Judge Furman,

I am writing this letter on behalf of Michael Castillero. We were introduced through mutual friends about ten years ago and have remained friendly. Staten Island is a tight knit family community, Michael and his wife Nikki were very supportive of charitable organizations.

I want to share a story that I believe illustrates Michael's true character as a caring kindhearted man. A few years back my husband was facing very serious health issues, hospitalized for long periods of time and his prognosis was very uncertain. Michael called me at least once a week to check on his condition. Unbeknownst to me Michael was dealing with very serious issues of his own yet never spoke of his troubles. His only concern was if I needed anything and did my husband have all the necessary resources for his lengthy rehabilitation. When I learned of Michael's troubles I was very surprised not only that it was completely out of character for the person I know, he put his problems aside for my family.

Over the last few months when it became my turn to reciprocate the support I didn't hesitate. What began as a discussion about the challenges his family was dealing with post trial sparked an idea to form a support network. Within days Michael had 45 active members, each one found a safe space to connect, talk and share their experiences.Even as Michael was dealing with his own issues, he found the time to be there for them. In such a short time this group has had a very positive impact for all involved.

I truly believe that Michael is someone who works to make a difference in his community. If granted the kindness of leniency Michael will pay it forward tenfold.

Thank you for your time and for considering the full picture of Michael's character when making your decision

Sincerely,

Danielle Mongelli
[redacted]

# EXHIBIT F

March 30, 2025

Hon. Jesse M. Furman
United States District Court
Southern District of New York
40 Foley Square
New York, NY 10007

Dear Judge Furman,

My name is Lucky Ott. I am a business professional and entrepreneur based in Texas, and I am writing to respectfully ask the Court to consider leniency in the sentencing of Michael Castillero, who will soon appear before you. I come to you not as a legal advocate, but as someone who has come to know Mike through a shared and deeply personal journey.

Mike and I met through a white-collar support group — a community of individuals navigating the difficult realities of federal legal proceedings, business setbacks, and the personal toll that accompanies them. These are not easy conversations to enter, and they require a rare combination of courage, humility, and genuine desire to grow. Mike has shown all of those qualities. Over the time I have known him in this capacity, I have seen him engage honestly with the hardest aspects of his situation, support others in the group who were struggling, and consistently demonstrate a commitment to accountability rather than avoidance.

What has impressed me most about Mike is not any single gesture, but the consistency of his character within our group. He listens. He reflects. He is honest about his failures in a setting where it would be far easier to deflect or minimize. On more than one occasion, I have personally witnessed him reach out to fellow members who were at their lowest — not because he was asked to, but because he understood what they were going through. That kind of empathy is not performed; it is who he is.

I also want the Court to know that Mike has not been untouched by the weight of these past several years. The legal process, the public nature of these proceedings, and the strain on his family have exacted a profound cost. I have watched him carry that burden with a seriousness that speaks to genuine moral reckoning — not a man waiting for consequences to end, but a man who has already begun a different chapter.

Your Honor, I understand the Court must weigh many competing factors. I do not ask that accountability be set aside. I ask only that the Court consider the full measure of the man before you — one who has shown genuine remorse, active participation in personal rehabilitation, and a

sincere desire to contribute positively to those around him. A sentence that allows Mike to continue that work, to support his family, and to remain a productive member of society would, in my view, serve justice well.

Respectfully submitted,

Lucky Ott



# EXHIBIT G

Hon. Jesse M. Furman

United States District Court

Southern District of New York

40 Foley Square

New York, NY 10007

Re: Michael Castillero – Sentencing April 15

Dear Honorable Judge Furman,

My name is Heather Vance, and I am writing on behalf of Michael Castillero, who is scheduled to be sentenced before this Court on April 15. I came to know Michael through a support group on X (formerly twitter) where individuals and families navigating the justice system connect for encouragement and support.

Over time, I have come to know Michael as a thoughtful, respectful, and compassionate person. In our interactions, he has consistently shown kindness toward others who are struggling and has offered encouragement to people facing similar incredibly difficult circumstances. His words reflect care for his family and a deep concern for the impact this process has had on those he loves.

The past few years have placed significant emotional and financial strain on Michael and his family. The uncertainty surrounding his case, the stress of prolonged legal proceedings, and the weight this situation has placed on his loved ones have been profound. Families endure sleepless nights, anxiety about the future, and the strain that comes from navigating complex legal matters. From what I have observed, this has deeply affected not only Michael, but those closest to him.

Despite these hardships, he has remained steady in his support for his family and others in similar situations. He continues to speak with hope about rebuilding, maintaining stability, and being present for the people who depend on him.

I respectfully ask the Court to consider compassion and leniency at sentencing. Michael is a man who values his family and community, and they value him deeply in return. A measured and merciful sentence would allow him the opportunity to continue supporting and strengthening those bonds.

Thank you for your time and consideration.

Respectfully,

Heather Vance

# EXHIBIT H

March 25, 2026

RE: **Character Reference for Michael Castillero**

To Whom It May Concern,

I am writing this letter to provide a formal character reference for Michael Castillero. I have known Michael and his family for several years and, based on my direct and consistent interactions with him, I can attest to his integrity, reliability, and strong moral character.

We first became acquainted when our children attended Staten Island Children's Academy together in their daycare program. This initial connection developed into a meaningful relationship as our children later attended Our Lady Star of the Sea School, where Michael and his family were active participants in the parish community. Through both school and church involvement, I observed firsthand Michael's consistent commitment to his family, his faith, and his community. He conducted himself in a manner that reflected responsibility, respect for others, and strong personal values.

When my family made the decision to relocate to Florida, we were genuinely pleased to learn that Michael and his family were also planning a move to the state. We were overjoyed at the opportunity to continue our friendship, which underscores the level of trust and respect we have for him as both an individual and a family man.

In addition to my personal observations, I have also witnessed Michael's professional competence and sound judgment. He provided investment insight to a group of my colleagues, several of whom chose to invest in Palantir based on his guidance. Following the company's public offering, those investments performed exceptionally well, with many realizing returns in excess of ten times their original investment. To this day, some of those individuals continue to hold their positions and remain highly satisfied with both the outcome and their experience working with Michael and Straight Path Venture Partners. This experience reinforced my view of Michael as someone who acts thoughtfully, responsibly, and with a high degree of professional acumen.

At all times during the period I have known him, Michael has demonstrated honesty, dependability, and a genuine concern for others. He is a devoted husband and father who prioritizes his family and contributes positively to those around him. I have never known him to act in a manner inconsistent with the values he presents, and I have consistently found him to be trustworthy and principled.

Based on my personal knowledge and experience, I offer this reference without reservation. I firmly believe Michael Castillero is a person of good character and integrity, and I respectfully ask that this be taken into full consideration.

Sincerely,

Mario Picone

Mario Picone

# EXHIBIT I

The Honorable Judge,

My name is Jeanette Mazzola, and I am writing in support of my son-in-law, Michael Castillero, in advance of his sentencing on April 15, 2026.

My daughter, Nikki, has been married to Michael for the past 15 years. Over that time, I have come to know him not only as a devoted husband, but as a loving father and an important part of our entire family. I care deeply for him, and I hope to express just how much he means to all of us.

Michael has been a constant, caring presence in our lives. My grandchildren love and adore him, and they would be truly devastated if he were not able to be there for them. Our family is very close, and his role in their lives is irreplaceable.

He is a kind, respectful, and loving person. I have seen firsthand the way he supports and cares for my daughter and their children. Unfortunately, I do not have the financial means to help support my daughter and grandchildren if anything were to happen that would take him away from them.

I am a senior living on Social Security for the past 20 years, and I am 75 years old. Because of this, I am unable to provide the level of support that Michael currently gives to his family.

I respectfully ask the Court to please consider leniency and compassion in your decision. Keeping Michael with his family would mean everything to them and to me.

Thank you for your time and consideration.

Sincerely,
Jeanette Mazzola



# EXHIBIT J

Hon. Jesse M. Furman
U.S. District Court
Southern District of New York
40 Foley Square
New York, NY 10007

To whom this may concern:

Greetings. I am writing to request leniency for my friend Michael Castillero, who will soon be sentenced by the Court.

I have a background in journalism -- a decade in covering police, fire, and courts for various local newspapers. I have since switched career paths to policy analysis and campaign communications. I have worked with Mr. Castillero on some media awareness projects, and have found him to be of good character, with a profound sense of urgency when it comes to finishing tasks. He is a hard worker whom I believe does not require time in prison in order to correct any alleged mistakes made in his professional or personal life.

He is a family man with a large financial load to bear, including supporting his young children, 10 and 12.

Thank you for your consideration. I am open to any questions the Court may have.

Respectfully,

Andy Hogue



# EXHIBIT K

Monsignor David L. Cassato



Hon. Jesse M. Furman
United States District Court
Southern District of New York
40 Foley Square
New York, N.Y. 10007

**Re: Michael Castillero**

Dear Honorable Jesse M. Furman,

My name is Monsignor David Cassato. I am a retired priest, currently residing at Our Lady of Mount Carmel in Williamsburg, which I celebrate Mass. I have been Police Chaplain of the Police Department of New York from 2001 to 2022.

I am writing this letter on behalf of Michael Castillero, who will soon be sentenced by the Court on April 15th. I have known Michael for a little over 10 years now. In all the years that I have known Michael I have never had a problem with him. He is a good family man and friend to the community and always willing to help and give his time. If ever needed anything Michael was always willing to give a hand.

Your Honour, I respectfully ask that you consider this letter and the information I have shared about Michael when deciding on his sentence. I truly believe that he has potential to be a productive member of society if given a second chance.

Thank you for your time and consideration.

Sincerely, Yours in Christ,

Msgr. David L Cassato

Monsignor David Cassato

# EXHIBIT L

**Ed Rosenberg** <[redacted]> Sun, Mar 29, 2026 at 4:02 PM
To: [redacted]

Hon. Jesse M. Furman
United States District Court
Southern District of New York
40 Foley Square
New York, NY 10007

Re: Sentencing Letter for Michael Castillero

Dear Judge Furman,

My name is Ephraim Rosenberg, and I lead ASGTG, one of the largest communities of Amazon third-party sellers. I have known Michael Castillero for the past year.

During this time, I have come to know Michael as a genuinely honest and good person. He is someone who carries himself with integrity and treats others with respect. In both personal and professional interactions, he has consistently demonstrated reliability and strong character.

On a personal level, Michael has been supportive of me during challenging times in my own life. That support was meaningful and reflects the kind of person he is—someone who shows up for others when it matters.

Over the past period, I have also seen how difficult this situation has been for him. It has taken a real toll, yet he has remained steady and focused on moving forward in a positive direction.

I respectfully ask the Court to take these qualities into account and extend leniency and compassion in sentencing. I believe Michael has the character to continue contributing positively to those around him.

Thank you for your time and consideration.

Respectfully,
Ephraim Rosenberg

--

Amazon Seller Group
asgtg
ED
Founder of ASGTG
[redacted]
www.asgtg.com



